

*EXHIBIT A, 15 pages*

(1)



**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY**

*Washington, D.C.*
*May 17, 2004*

## JOINT STATEMENT OF
### THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
### AND THE DEPARTMENT OF JUSTICE

## *REASONABLE ACCOMMODATIONS UNDER THE FAIR HOUSING ACT*

### Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]    The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

[2]    The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See* Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted.

[3]    42 U.S.C. § 3604(f)(3)(B).

reasonable accommodations.[4]

## Questions and Answers

    1. What types of discrimination against persons with disabilities does the Act prohibit?

    The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency,  because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4]    Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794.  Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities.  Although Section 504 imposes greater obligations than the Fair Housing Act, (e.g., providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas),  the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504.  See U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and "Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/ sect504faq.cfm#anchor272118).

[5]    The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities  42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). See also H.R. Rep. 100-711 – '24 (reprinted in 1988 U.S.C.A.N. 2173, 2184–85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). Accord: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

[6]    42 U.S.C. § 3604(f)(3)(B).  HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R.  § 100.204.



make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[7]  With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

### 2. Who must comply with the Fair Housing Act's reasonable accommodation requirements?

Any person or entity engaging in prohibited conduct – *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling – may be held liable unless they fall within an exception to the Act's coverage.  Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services.  Courts have also applied the Act to state and local governments, most often in the context of exclusionary zoning or other land-use decisions. *See e.g.*, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002).  Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings.  The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

### 3. Who qualifies as a person with a disability under the Act?

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.  *Social Security DISABILITY*

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

---

[7]     This Statement does not address the principles relating to reasonable modifications.  For further information see the HUD regulations at 24 C.F.R. § 100.203.  This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.



The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[8]  This list of major life activities is not exhaustive. *See e.g.*, Bragdon v. Abbott, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

**4. Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?**

No, juvenile offenders and sex offenders, by virtue of that status, are <u>not</u> persons with disabilities protected by the Act.   Similarly, while the Act does protect persons who are recovering from substance abuse, it does <u>not</u> protect persons who are currently engaging in the current illegal use of controlled substances.[9]  Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

**5. How can a housing provider determine if an individual poses a direct threat?**

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general.  A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts).  The assessment must consider:  (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat.  Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm).  In such a situation, the provider may request that the individual document

---

[8]    The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity.  See Toyota Motor Mfg. Kentucky, Inc. v. Williams, 122 S. Ct. 681, 692, 693 (2002).  If it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job. *See* Sutton v. United Airlines, Inc., 527 U.S. 470, 492 (1999).

[9]     *See, e.g.*, United States v. Southern Management Corp., 955 F.2d 914, 919 (4th Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance").

how the circumstances have changed so that he no longer poses a direct threat.  A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy.  The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 1:**  A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence.  On her application to rent an apartment, a woman notes that she currently resides in Cambridge House.  The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism.  Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant.  The rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct. The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit.  However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references.  If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

**Example 2:**  James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat.  The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents.  Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat.  Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process.  James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication.  Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability.  The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and



periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

**6. What is a "reasonable accommodation" for purposes of the Act?**

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

> **Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

> **Example 2:** A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent. A tenant has a mental disability that makes her afraid to leave her unit. Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation. The provider must make an exception to its payment policy to accommodate this tenant.

> **Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway. The housing

provider must make an exception to its "no pets" policy to accommodate this tenant.

### 7. Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?

Yes. A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disability-related need for the accommodation. In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable – *i.e.*, if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations. The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it. An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

**Example:** As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service. Accordingly, the requested accommodation may not be reasonable. If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's disability-related needs – for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site. Such an accommodation would not involve a



P.8

fundamental alteration of the provider's operations and would involve little financial and administrative burden for the provider while accommodating the tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

**8. What is a "fundamental alteration"?**

A "fundamental alteration" is a modification that alters the essential nature of a provider's operations.

> **Example:** A tenant has a severe mobility impairment that substantially limits his ability to walk. He asks his housing provider to transport him to the grocery store and assist him with his grocery shopping as a reasonable accommodation to his disability. The provider does not provide any transportation or shopping services for its tenants, so granting this request would require a fundamental alteration in the nature of the provider's operations. The request can be denied, but the provider should discuss with the requester whether there is any alternative accommodation that would effectively meet the requester's disability-related needs without fundamentally altering the nature of its operations, such as reducing the tenant's need to walk long distances by altering its parking policy to allow a volunteer from a local community service organization to park her car close to the tenant's unit so she can transport the tenant to the grocery store and assist him with his shopping.

**9. What happens if providing a requested accommodation involves some costs on the part of the housing provider?**

Courts have ruled that the Act may require a housing provider to grant a reasonable accommodation that involves costs, so long as the reasonable accommodation does not pose an undue financial and administrative burden and the requested accommodation does not constitute a fundamental alteration of the provider's operations. The financial resources of the provider, the cost of the reasonable accommodation, the benefits to the requester of the requested accommodation, and the availability of other, less expensive alternative accommodations that would effectively meet the applicant or resident's disability-related needs must be considered in determining whether a requested accommodation poses an undue financial and administrative

burden.

**10. What happens if no agreement can be reached through the interactive process?**

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation. If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law and decide if the housing provider violated that law. For more information about the complaint process, see question 19 below.

**11. May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?**

No. Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

> **Example 1:** A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes. He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises. It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes. Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter. However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property. If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

> **Example 2:** Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation. The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal. However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for

No. The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests. However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted. If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling. See Questions 16 - 18, which discuss the disability-related information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

**14. Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?**

No. A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made. A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

**15. What if a housing provider fails to act promptly on a reasonable accommodation request?**

A provider has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

**16. What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?**

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities. Housing providers may, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:



the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**12. When and how should an individual request an accommodation?**

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf. An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation." However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made. To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made. However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

> **Example:** A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend. The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

**13. Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?**



- An inquiry into an applicant's ability to meet the requirements of tenancy;

- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;

- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and

- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:** A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis. The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units. However, the provider may not ask applicants if they have other types of physical or mental impairments. If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:** A housing provider operates housing that is legally limited to persons with chronic mental illness. The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing. However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments. If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation. See Questions 17 and 18 below.

**17. What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?**

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability. If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information

about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

**Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

**Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

**Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

**18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?**

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability (*see* Answer 16, above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[10] or a credible statement by the individual). A doctor or other

---

[10]    Persons who meet the definition of disability for purposes of receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.*, Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999)

*(P.14)*

medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

(19.) **If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

*See EXHIBIT C, page 6, QUESTION 1, DISCRIMINATE BECAUSE OF DISABILI*

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial. If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

- By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;

- By completing the "on-line" complaint form available on the HUD internet site: http://www.hud.gov; or

- By mailing a completed complaint form or letter to:

  Office of Fair Housing and Equal Opportunity
  Department of Housing & Urban Development
  451 Seventh Street, S.W., Room 5204
  **Washington, DC 20410-2000**

*See pages 19-20 of 70 of complaint*

(noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated. The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance. The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act. To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

> U.S. Department of Justice
> Civil Rights Division
> Housing and Civil Enforcement Section – G St.
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530

For more information on the types of housing discrimination cases handled by the Civil Rights Division, please refer to the Housing and Civil Enforcement Section's website at http://www.usdoj.gov/crt/housing/hcehome.html.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit. However, litigation can be an expensive, time-consuming, and uncertain process for all parties. HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation. HUD attempts to conciliate all Fair Housing Act complaints. In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.



U.S. Department of
Housing and Urban
Development

*EXHIBIT B, 10 pages*
*①*

Español

Home (/) / Program Offices
(/program_offices) / FHEO Home
(/program_offices/fair_housing_equal_opp)
/ Learn About the FHEO Complaint
and Investigation Process

*FEDERAL HOUSING EQUAL OPPORTUNITY*

## Learn About the FHEO Complaint and Investigation Process

FHEO investigates complaints,
helps individuals obtain
agreements to resolve
complaints, and takes actions as
needed to enforce the law.

Overview of FHEO's Complaint and
Investigation Process

Process for Fair Housing Act
Complaints

Process for Complaints of
Discrimination in Housing and
Community Development Programs

## Overview of FHEO's Complaint and Investigation Process

*My complaint was TIMELY*

*Last date for me was June 15 2023*

*My complaint was received by _____ on 06/08/2023 ____*

FHEO begins its complaint
investigation process shortly after
receiving a complaint. You must
file your complaint within one year
of the last date of the alleged
discrimination under the Fair
Housing Act. Other civil rights
authorities allow for complaints to
be filed after one year for good
cause, but FHEO recommends
filing as soon as possible.
Generally, FHEO will either
investigate the complaint or refer
the complaint to another agency to
investigate. Throughout the
investigation, FHEO will make
efforts to help the parties reach an
agreement. If the complaint cannot
be resolved voluntarily by an
agreement, FHEO may issue
findings from the investigation. If
the investigation shows that the
law has been violated, HUD or the
Department of Justice may take

**Provide Feedback**

*Va*



U.S. Department of
Housing and Urban
Development

Español

*DUPLICATE OF PAGE 1/9*

Home (/) / Program Offices
(/program_offices) / FHEO Home
(/program_offices/fair_housing_equal_opp)
/ Learn About the FHEO Complaint
and Investigation Process

*FEDERAL HOUSING EQUAL OPPORTUNITY*

## Learn About the FHEO Complaint and Investigation Process

FHEO investigates complaints, helps individuals obtain agreements to resolve complaints, and takes actions as needed to enforce the law.

Overview of FHEO's Complaint and Investigation Process

Process for Fair Housing Act Complaints

Process for Complaints of Discrimination in Housing and Community Development Programs

## Overview of FHEO's Complaint and Investigation Process

*My complaint was TIMELY Last date for me was June 15, 2023*

FHEO begins its complaint investigation process shortly after receiving a complaint. You must file your complaint within one year of the last date of the alleged discrimination under the Fair Housing Act. Other civil rights authorities allow for complaints to be filed after one year for good cause, but FHEO recommends filing as soon as possible. Generally, FHEO will either investigate the complaint or refer the complaint to another agency to investigate. Throughout the investigation, FHEO will make efforts to help the parties reach an agreement. If the complaint cannot be resolved voluntarily by an agreement, FHEO may issue findings from the investigation. If the investigation shows that the law has been violated, HUD or the Department of Justice may take legal action to enforce the law.

*My complaint was recieved by FHEO on 06/09/2023 + 06/14/2023.*

Provide Feedback



*Depending on the type of* complaint you file, **FHEO may follow a different investigative process, such as referring the matter to a Fair Housing Assistance Program partner.** The processes of HUD's Fair Housing Assistance Program (FHAP) (/program_offices/fair_housing_equal_opp/partners/FHAP) partners may vary by agency.

**To learn how to file a complaint with HUD, please visit the File a Complaint (https://www.hud.gov/program_offices/fair_housing_equal_opp/online-complaint) page. Complaints can be submitted online as well as by telephone, e-mail, or mail.**

*See EXHIBIT A,*
*JOINT STMT HUD*
*+ DOS REA. ACCOM.*
*P, 14, #19*

## Intake

**When an individual reports possible discrimination, we check whether a formal compla we enforce.**

*What to Expect:*

*WAS NOT NECESSARY*

- FHEO may interview the individual who wishes to file a complaint (http://www.hud.gov/program_offices/fair_housing_equal_opp/online-complaint).
- Where appropriate, FHEO will draft a formal complaint, have the individual review and parties that a complaint has been filed.
- As part of HUD's Fair Housing Assistance Program (FHAP), FHEO may refer a fair hous government agency for investigation.
- In certain circumstances, FHEO may initiate a compliance review based on the informa

## Investigation

**After a formal complaint is filed, we investigate the allegations.**

*What to Expect:*

- HUD will assign one or more investigators to investigate the allegations made in the con
- After you submit a complaint, the investigator may ask you to provide more informatio prepared to provide:
  - A timeline of events, starting with the first contact you had with the person or enti
  - The locations of events;
  - Any people who were present when events occurred;
  - Any other people who might have information related to your complaint; and
  - Any relevant documents.
- HUD will provide the party against whom the complaint has been filed notice and an op
- HUD may gather evidence in many ways, including interviewing parties and witnesses, properties.
- After completing the investigation, FHEO will send you a **written report of its** findings.

*NOT FCHR !!!*



## Conciliation or Voluntary Compliance

**At any time, the parties can resolve the complaint under terms that are satisfactory to th**

*What to Expect:*

- Throughout the investigation, HUD will try to help the parties resolve the complaint thi voluntary; no party is required to accept an offer.

- If the parties agree, HUD will prepare an agreement for signature.

- Following a signed agreement, HUD will close the investigation and monitor complianc

- Depending on the authorities that apply to the complaint, HUD may resolve the investi Conciliation Agreement, a Voluntary Compliance Agreement, or both.

## Legal Action

**Where appropriate, we take actions to enforce the law.**

*What to Expect:*

- The government may bring a Fair Housing Act or other civil rights case based on the fir of relief sought in such cases may include compensation for victims, changes to policie

- When the government brings a legal action, it does not charge any fees or costs to indiv

- Cases before HUD Administrative Law Judges are handled by HUD's Office of General C are handled by the U.S. Department of Justice.

## Process for Fair Housing Act Complaints

Learn more about what you can expect if a Fair Housing Act complaint is filed with HUD.

What Happens After the Investigation of a Fair Housing Act Complaint?

HUD Administrative Law Judge Hearing

Civil Trial in Federal District Court

Determination of No Reasonable Cause and Dismissal

Reconsiderations of No Reasonable Cause Determinations

You May File a Private Lawsuit

If You're Going to Lose Housing Through Eviction or Sale



## What Happens After the Investigation of a Fair Housing Act Complaint?

When your complaint's investigation is complete, HUD will issue a determination as to whether or not reasonable cause exists to believe discrimination.

P.4

OCCURRED IF HUD DETERMINES THAT
there is reasonable cause to
believe that discrimination
occurred, HUD will issue a
Determination of Reasonable
Cause and a Charge of
Discrimination. All complainants
and respondents have twenty
(20) days after receiving notice of
the Charge to decide whether to
have the case tried before a
Federal District Court judge. If no
one does so, the case is heard by
a HUD Administrative Law Judge
(ALJ).

*THIS DIDN'T HAPPEN*

Since this is a CIVIL
Complaint, the
Preponderant

EVIDENT LAW!!!
should be applied!
* REASONABLE
Doubt (i.e. O.J.Sim
V. Nicole Brown)

## HUD Administrative Law Judge Hearing:

*NOT AN ADMIN. LAW JUDGE (ALJ) FOR DOAH*

If neither party elects to have a
federal civil trial before the 20-
day Election Period expires, HUD
will promptly schedule a hearing
for your case before an ALJ. The
**ALJ hearing will be conducted in**
or near the locality where the
discrimination allegedly
occurred. During the ALJ
hearing, the parties have the
right to appear in person, to be
represented by legal counsel, to
present evidence, to cross-
examine witnesses and to
conduct discovery of evidence.
HUD attorneys will be assigned to
represent you during the ALJ
hearing at no cost to you;
however, you may also choose to
intervene in the case and retain
your own attorney. At the
conclusion of the hearing, the
ALJ will issue a decision based on
**findings of fact and conclusions
of law.** If the ALJ concludes a
violation of the Fair Housing Act
occurred, the following relief can
be ordered:

- Compensation for your actual
  damages, including out-of-
  pocket expenses and emotional
  distress damages.

- Permanent injunctive relief,
  such as an order not to
  discriminate.

- Appropriate equitable relief,
  such as making housing
  available to you.

- Payment of reasonable
  attorney's fees if you hired a

private attorney.

- Payment of a civil penalty to vindicate the public interest.

## Civil Trial in Federal District Court:

If any party elects to have a federal civil trial, HUD must refer your case to the U.S. Department of Justice for enforcement. The U.S. Department of Justice will file a civil lawsuit on your behalf in the U.S. District Court in the district in which the discrimination allegedly occurred. You also may choose to intervene in the case and retain your own attorney. Either party may request a jury trial, and both parties have the right to appear in person, to be represented by legal counsel, to present evidence, to cross-examine witnesses, and to participate in the discovery of evidence. If the Federal Court decides in your favor, a Judge or jury may order the following relief:

*THIS NEVER HAPPENED BECAUSE MY COMPLAINT WAS MISHANDLED*

- Compensation for actual damages, including out-of-pocket expenses and emotional distress damages.

- Permanent injunctive relief, such as an order not to discriminate.

- Appropriate equitable relief, such as making housing available to you.

- Payment of reasonable attorney's fees if you hired a private attorney.

- Payment of punitive damages.

## Determination of No Reasonable Cause and Dismissal:

If HUD finds that there is no reasonable cause to believe that discrimination occurred, HUD will dismiss your complaint with a Determination of No Reasonable Cause. HUD will notify the parties of the dismissal, and you may request a copy of the Final Investigative Report.

*THIS NEVER HAPPENED NOT FCHR*



### Reconsiderations of No Reasonable Cause Determinations:

The Fair Housing Act provides no formal appeal process for complaints dismissed by HUD. However, if your complaint is dismissed with a Determination of No Reasonable Cause, you may submit a written request for a reconsideration review to: Director, FHEO Office of Enforcement, U.S. Department of Housing and Urban Development, 451 7th Street, SW, Room 5226, Washington, DC 20410-2000.

*← DOESN'T APPLY. HUD NEVER DISMISSED MY COMPLAINT*



### You May File a Private Lawsuit:

You may file a private civil lawsuit, even if you have already filed a complaint with HUD. You must file your lawsuit within two (2) years of the most recent date of alleged discriminatory action. If you have already filed a complaint with HUD, the time during which HUD was processing your complaint is not counted in the 2-year filing period. You must file your lawsuit at your own expense; however, if you cannot afford an attorney, the court may appoint one for you. You may not be able to file a federal private civil suit if (1) you have already signed a HUD Conciliation Agreement to resolve your HUD complaint; or (2) an Administrative Law Judge has commenced a hearing for your complaint.

*1 + 2*
*Doesn't Apply BECAUSE A HUD ALJ DIDN'T PROMPTLY SEE SCHEDULE A HEARING BEFORE A HUD (NOT DOA ALJUDGE.*

### If You're Going to Lose Housing Through Eviction or Sale:

If you could lose the home due to discrimination, HUD may be able to assist you during the investigation. Inform your HUD investigator as soon as possible if you believe you may lose the home due to unlawful discrimination.



## Process for Complaints of Discrimination in Housing and Community Development Programs

If you file a fair housing complaint that also alleges a violation of Title VI, Section 504, the ADA, or other civil rights laws FHEO enforces, some additional FHEO procedures apply.

Process to Resolve a Complaint

Informal Resolution and Voluntary Compliance

Letter of Findings

Request for Review of Letter of Findings in Section 504 Complaint

If Voluntary Compliance Cannot Be Achieved

## Process to Resolve a Complaint:

FHEO will try to resolve your complaint through informal means, called a Voluntary Compliance Agreement. If FHEO's investigation finds there has been noncompliance with civil rights requirements, FHEO will issue a letter of findings. If FHEO determines that efforts to resolve the matter through voluntary compliance are unsuccessful, FHEO may pursue enforcement actions to obtain a just resolution.

## Informal Resolution and Voluntary Compliance:

HUD encourages the informal resolution of matters and may attempt to resolve a matter through informal means at any stage in the processing of the complaint. During the complaint process, HUD will assist the parties in resolving the complaint through informal resolution or voluntary compliance. FHEO will develop a written voluntary compliance agreement to obtain the resolution of findings of noncompliance. A Voluntary Compliance Agreement will obtain assurances from the Program to remedy any violations and ensure that the

Program will not violate the
rights of other persons under fair
housing or civil rights authorities.

## Letter of Findings:

HUD will notify the parties about
the results of its investigation in a
Letter of Findings. The letter will
include information about the
facts found during the
investigation and whether HUD
found non-compliance with fair
housing and civil rights laws.

## Request for Review of Letter of Findings in Section 504 Complaint:

If a complaint has been brought
alleging non-compliance with
Section 504, and a Letter of
Findings has been issued, either
party may request that the letter
be reviewed within 30 days of the
receipt of the letter. HUD will
either sustain or modify the
findings, and this will become the
agency's formal determination.
HUD will issue a Letter of
Determination either sustaining
or modifying the findings.

## If Voluntary Compliance Cannot be Achieved:

If a just resolution of HUD's
findings of noncompliance
cannot be reached through a
voluntary compliance agreement,
HUD can use other means to
achieve compliance. Among
other things, HUD can initiate an
enforcement proceeding before
an Administrative Law Judge or
refer the matter to the
Department of Justice and
recommend that it bring an
enforcement action in Federal
Court.

Back to FHEO Home
(/program_offices/fair_housing_equal_opp)

Agency

Resources

U.S. Department of





451 7th Street, S.W., Washington, DC 20410
T: 202-708-1112
TTY: 202-708-1455

Find a HUD office near you (/localoffices)





Privacy Policy (/privacy_policy) | Web Policies
(/library/bookshelf11) | Accessibility (/accessibility) |
Sitemap (/siteindex)

EXHIBIT C, 10
(P.1)

## Re: <External Message> Fair Housing Complaints

From:  Linda Chase (lindachase58@gmail.com)

To:    chase-linda@sbcglobal.net

Date:  Tuesday, November 26, 2024 at 10:50 AM CST

 On Wed, Oct 25, 2023 at 6:34 AM Investigations04 <Investigations04@hud.gov> wrote:

Good morning,

 This message acknowledges receipt of your email.

Your correspondence has been forwarded to the assigned investigator, Equal Opportunity Specialist (EOS) Lisa
Sutherland, email address lisa.sutherland2@fchr.myflorida.com

From this point forward, please email the above-referenced investigator directly for any questions relating to the
investigation or conciliation of this complaint.

Thank you.

**From:** Linda Chase <lindachase58@gmail.com>
**Sent:** Tuesday, October 24, 2023 11:05 AM
**To:** Investigations04 <Investigations04@hud.gov>
**Subject:** <External Message> Fair Housing Complaints

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you
recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it
to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

9314 5000 3860 0238 7028 54        00000190

U.S. Department of Housing and Urban Development
Region IV Office of Fair Housing and Equal Opportunity
Five Points Plaza
40 Marietta Street, 16th Floor
Atlanta, GA 30303-2806

## AUTHORIZATION TO RELEASE MEDICAL INFORMATION

This information is being requested in connection with the investigation of a housing discrimination complaint filed with the U.S. Department of Housing and Urban Development. Under the Fair Housing Act ("the Act"), if a complaint is filed on the basis of disability, physical or mental, medically related documentation verifying the complainant's status is required.

The Complainant, *LINDA CHASE* has signed this authorization form giving our office or its designated agent, permission to contact the healthcare provider identified below regarding the Complainant's disability status and the necessity for a reasonable accommodation because of such disability.

### COMPLAINANT:

*After completing this form, please scan and email it to:  Investigations04@hud.gov*

I herewith authorize release of my medical records and any medical certification required for determining my Disability status with reference to my complaint of Housing Discrimination. This release is for the sole purpose of the complaint investigation:

*Linda Chase* 11-30-1958
Complainant's Signature and Date        Complainant's Birthdate

HUD Case Number: *04-23-5235-8*

*NITIN THAPAR* *PSYCHIATRY*
Doctor's Name (Please Print)        Area(s) of Specialty

*10745 165th St Orland Park, IL 60467*
Doctor's mailing address

*(708) 799-8384* *(708) 799-1305*
Doctor's telephone number        Fax Number

P.3

8314.8000.3860.0729.7028.54                                    00000 100 4

U.S. Department of Housing and Urban Development
Region IV Office of Fair Housing and Equal Opportunity
Five Points Plaza
40 Marietta Street, 16th Floor
Atlanta, GA 30303-2806

## AUTHORIZATION TO RELEASE MEDICAL INFORMATION

This information is being requested in connection with the investigation of a housing discrimination complaint filed with the U.S. Department of Housing and Urban Development. Under the Fair Housing Act ("the Act"), if a complaint is filed on the basis of disability, physical or mental, medically related documentation verifying the complainant's status is required.

The Complainant, _Linda Chase_ , has signed this authorization form giving our office or its designated agent, permission to contact the healthcare provider identified, below regarding the Complainant's disability status and the necessity for a reasonable accommodation because of such disability.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COMPLAINANT:

*After completing this form, please scan and email it to:  Investigations04@hud.gov.*

I herewith authorize release of my medical records and any medical certification required for determining my Disability status with reference to my complaint of Housing Discrimination. This release is for the sole purpose of the complaint investigation.

_Linda Chase_                                    _11-30-1958_
Complainant's Signature and Date                 Complainant's Birthdate

HUD Case Number: _04-23-5520-8_

_NITIN THAPAR_                           _PSYCHIATRY_
Doctor's Name (Please Print)             Area(s) of Specialty

_10745_
_10745  165th St. Orland Park, IL 60467_
Doctor's mailing address

_(708) 799-8384_                          _(708) 799-1305_
Doctor's telephone number                Fax Number

**M** Gmail                                                    Linda Chase <lindachase58@gmail.com>

446029 Chase vs. SJPC, Inc., et al

therland, Lisa <Lisa.Sutherland2@fchr.myflorida.com>          Tue, Nov 28, 2023 at 2:32 PM
Linda Chase <lindachase58@gmail.com>

*[handwritten: Referring to Arbor Properties 5:24-cv-158- (FCHR Case #202443552)]*

Is. Chase:

The reason you did not need a medical release in your other case is because you did not file on reasonable accommodation *[handwritten X marks]*

*[handwritten: FOR CHASE VS. ST. JOE. Case 20246029]*

have searched my in box and my spam folder.  I do not have the signed Medical Release you allegedly sent me.

*[handwritten: CIVIL SUIT 5:24-cv-00157- RH-MJF]*

Please be advised that this is my final request for the Medical Release.

Thank you for your assistance.

Sincerely,


Lisa A. Sutherland

Government Operations Consultant I

Florida Commission on Human Relations

4075 Esplanade Way, Room 110

Tallahassee, FL 32399

Phone: 850-907-6818

Fax: 850-487-1007


*United in One Goal: Equal Opportunity and Mutual Respect*

M Gmail                                                      Linda Chase <lindachase58@gmail.com>

dical Release

herland, Lisa <Lisa.Sutherland2@fchr.myflorida.com>         Wed, Nov 29, 2023 at 6:16 AM
Linda Chase <lindachase58@gmail.com>

s. Chase:

apologize to you. I have received it on November 3, 2023. I will send the Medical Release and Medical Certification to your
octor.

hank you, and again I apologize for missing the release.

incerely,

Lisa A. Sutherland

Government Operations Consultant I

Florida Commission on Human Relations

4075 Esplanade Way, Room 110

Tallahassee, FL 32399

Phone: 850-907-6818

Fax: 850-487-1007

*United in One Goal: Equal Opportunity and Mutual Respect*

*Correspondence made or received in connection with the transaction of official*
*business by a state agency, unless exempt or made confidential by law, is*
*considered a public record and may be subject to disclosure upon request.*

Quoted text hidden]

(P.6)

CASE # 0624246 90

Office of Workers' Compensation Programs

OMB No. 1240-0046
Expires: 01-31-2018

1. Patient's name
CHACE    LINDA    CAROL

2. Date of injury
04 23 03

3. OWCP File Number
0624246 90

4. What history of the employment injury or occupational disease did the patient give to you?
Pt describes depression, anxiety sx attributed to work px

5. Is there any history or evidence of concurrent or pre-existing injury or disease or physical impairment?
☒ Yes  ☐ No   Pt describes hx of GAD, MDD
ICD Code(s): F41.1, F33.2

6. What were your findings? (Include results of X-Rays, laboratory reports, etc.)
Uncontrolled sx of depression + anxiety

7. What is your specific diagnosis? (related to the employment activity)
MDD, recurrent, severe    GAD
ICD Code(s): F33.2, F41.1

8. Do you believe that condition(s) found was caused or aggravated by an employment activity as described in item 4? (Please explain answer)
☒ Yes  ☐ No

9. Did injury require hospitalization? If no, go to item #13   ☒ No

10. Date of admission mo. day yr.

11. Date of discharge mo. day yr.

12. Additional Hospitalization required ☐ Yes ☐ No

13. What treatment did you prescribe?
# Lexapro 10mg q daily, Trazodone 200mg QHS

14. Date of first examination
04 04 19

15. Date(s) of treatment
04 17 19  05 01 19  05 07 19

16. Date of discharge from treatment
N/A

17. Period of total disability From 12 28 18 Thru Current

18. Period of Partial Disability

19. Date employee able to resume light work

20. Date employee is able to resume regular work 08 15 19

21. Has employee been advised that he/she can return to work? ☐ Yes ☒ No

22. If yes, on what date was he/she advised?

23. If employee is able to resume only light work...

24. Are any permanent effects expected as a result of this injury? ☐ Yes ☐ No

25. Remarks

26. If you have referred the employee to another physician provide the following:
Name   Specialty
Address
City   State   Zip   ☐ Consultation ☐ Treatment

29. I certify... Signature of Physician

30. Tax ID Number  72-150XXX

29. Name of Physician  Nitin Thapar, DO
Address 1045 105th St
Oibata IL 60162

31. Do you specialize? ☒ Yes ☐ No
32. If yes, state your specialty  Psychiatry

CA-20 (Rev. 08-14)

 Gmail

Linda Chase <lindachase58@gmail.com>

P-0
P.1

roof of disability for SJSC 202446029

nda Chase <lindachase58@gmail.com>                                    Wed, Dec 6, 2023 at 11:10 AM
:: Sutherland, Lisa <Lisa.Sutherland2@fchr.myflorida.com>, <casey.snipes@fchr.myflorida.com>,
diana.diaz@fchr.myflorida.com>, <kristen.clarke@usdoj.gov>
:: Linda Chase <chase-linda@sbcglobal.net>, <larrychapi@gmail.com>

Lisa,
I contacted my doctor concerning the medical release. There's a great possibility that it will not be completed by Dec. 8, 2023. You delayed the process because you had my signed release form dated 11/03/2023 since November 2, 2023; therefore, I have not only provided proof of my disability via RECORDS from the SSA, MSPB, USPS, my psychiatrist, Nitin Thapar of Premier Psychiatry but also page 3 of the Joint Statement between HUD & DOJ page 3, item 3, #3 individuals with a record of such an impairment. I also provided you proof that my OWCP/FECA benefits have been approved, and I am just waiting for payment. I have provided proof that four (4) government agencies have deemed me disabled which is sufficient evidence/proof of my disability. This was provided to you in the Arbor Properties Retaliation complaint when I requested Reasonable Accommodation when it was alleged the complaint was untimely. Additionally, I have again provided you a copy of pages 1 & 2 of the 15 page process of FHEO. I underlined the pertinent portion in RED. Please read by the asterisk," Throughout the investigation, FHEO will make efforts to help the parties reach an agreement." This NEVER happened with Arbor Properties. Arbor Properties complaint should have NEVER gone to DOAH, case 23-4297.
I will make sure I sent you my proposal for a settlement for SJSC, thank you.
image.pdf





UNITED STATES
POSTAL SERVICE

HUMBLE
1202 E 1ST ST
HUMBLE, TX 77338-9998
(800)275-8777

10.10/2024                           02:18 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| Priority Mail® | 1 | | $10.45 |
| Flat Rate Env | | | |

Mailing, FL 32577    *Worley*
11.40 oz
Expected Delivery Date
10/12/2024
Racking #:
9502 7065 8841 4284 2284 16    9502 7065 8841 4284 2284 16

| | | | |
|---|---|---|---|
| included | | | $0.00 |
| | | | $4.?? |
| Tracking # | | | $4.10 |
| 9??? 3193 3196 1841 55 | | | |
| Total | | | $19.40 |



| First-Class Mail® | 1 | | $3.43 |
|---|---|---|---|
| Large Envelope | | | |

*Arbor Prop*
*Jill + thews*
Tallahassee, FL 32303
Weight: 3.?0 oz
Estimated Delivery Date
Tue ??

| First-Class | 1 | | $2.04 |
|---|---|---|---|
| Large Enve... | | | |

Tallahassee, FL 32301    *Hobb*
Weight: 2 oz
Estimated Delivery Date
Tue 10/15/2024

| -Class Mail® | 1 | | $2.31 |
|---|---|---|---|
| Envelope | | | |

..., FL 32502    *CLERK OF CT.*
3.40 oz    *NDCL*
...ated Delivery Date
Tue 10/15/2024
Racking #:
9?? 7?66 8841 428? 2?64 33

(P.9)

# USPS Tracking Intranet
## Delivery Signature and Address

**Tracking Number: 9502 7065 8841 4284 2284 16**

This item was delivered on 10/17/2024 at 10:59:00

< Return to Tracking Number View



Signature

Address

# Product Tracking & Reporting



UNITED STATES
POSTAL SERVICE.

Home          Search          Reports          Manual Entry          Rates/
                                                                      Commitments          PTR / EDW          Customer
                                                                                                              Information          November 14, 2024

P.10

## USPS Tracking Intranet

## Delivery Signature and Address

**Tracking Number: 9514 7065 9516 4315 9881 10**

**This item was delivered on 11/14/2024 at 09:54:00**

< Return to Tracking Number View



| | |
|---|---|
| Signature | A Bridge... |
| Address | 1 North Palafox |

Enter up to 35 items separated by commas.

Select Search Type:     Quick Search ⌄     Submit

Product Tracking & Reporting, All Rights Reserved
Version: 25.1.1-edcb7659